UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                  :

ALLISON WILLIAMS,                           :
                                                  :
                           Plaintiff,   :
                                                  :
            - against -               :
                                                  :

NEW YORK CITY HOUSING AUTHORITY, :
BRIAN CLARKE, MICHAEL KELLY, and  :
MELISSA MARK-VIVERITO,           :
                                                  :
                        Defendants.  :
                                                  :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/24/2021

16-CV-8193 (VSB)

**OPINION & ORDER**

Appearances:

Marcel Florestal
Florestal Law Firm
New York, NY

*Counsel for Plaintiff*

Adam G. Kurtz
E72 Law
New York, NY

Jane Elizabeth Lippman
Filippatos PLLC
White Plains, NY

*Counsel for Defendants New York City Housing Authority, Brian Clarke, and Michael Kelly*

Heather Marie Martone
Reed Smith LLP
Los Angeles, CA

Natalie Sharon Marcus
New York City Law Department
New York, NY

*Counsel for Defendant Mark-Viverito*

VERNON S. BRODERICK, United States District Judge:

Plaintiff Allison Williams ("Plaintiff" or "Williams") brings this action alleging: (1) creation of a hostile work environment based on race and national origin, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 296, *et seq.* (First Claim), the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101, *et seq.* (Second Claim), and 42 U.S.C. § 1981 (Seventh Claim); (2) aiding and abetting violations of the NYSHRL and the NYCHRL (Third and Fourth Claim, respectively); (3) deprivation of Plaintiff's constitutional rights, in violation of 42 U.S.C. § 1983 (Sixth Claim); and (4) violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution (Eighth Claim). (Doc. 6, Am. Compl. ¶¶ 38–68.)[1]

Before me are the motions of (1) Defendants New York City Housing Authority ("NYCHA"), NYCHA Senior Vice President Brian Clarke ("Clarke"), and NYCHA General Manager Michael Kelly ("Kelly") (collectively, "the NYCHA Defendants") and (2) Defendant Former New York City Council Speaker Melissa Mark-Viverito ("Mark-Viverito" or "Former Speaker") (together with the NYCHA Defendants, "Defendants") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docs. 83 and 84.) Because the record does not support a finding that there are any genuine issues as to any material fact that would support Plaintiff's claims, Defendants' motions are hereby GRANTED.

## I.      **Factual Background**[2]

Plaintiff Allison Williams is an African-American woman who began her career working at NYCHA in 1984. (Am. Compl. ¶¶ 6, 12; Doc. 86, Mark-Viverito R. 56.1 Statement ¶¶ 4, 5.)[3]

---

[1] "Am. Compl." refers to the amended complaint filed by Plaintiff on October 28, 2016. (Doc. 6.)

[2] The statements of fact set forth in this section are undisputed unless noted otherwise.

[3] "Mark-Viverito R. 56.1 Statement" refers to Defendant Mark-Viverito's Local Rule 56.1 Statement of Undisputed

After rising through the ranks in various positions at NYCHA, she began working as a housing manager of the Mill Brook Houses ("Mill Brook") in 2006.[4]   (Mark-Viverito R. 56.1 Statement ¶ 12; Doc. 87, Marcus Decl., Ex. G, Williams Dep. Tr. 25:4-28:7.)[5]  Plaintiff's civil service status under the title of housing manager title meant that her employment could not be terminated in the absence of disciplinary charges and a general trial.  (Doc. 78, NYCHA R. 56.1 Statement ¶ 10;[6] Williams Dep. Tr. 24:8-19.)

This action arises out of Plaintiff's claim that during a July 30, 2015 meeting with former New York City Council Speaker Melissa Mark-Viverito, which Plaintiff attended with other NYCHA employees, the Former Speaker demanded that NYCHA replace Plaintiff as the Manager at Mill Brook with a "Spanish Manager."  Williams claims that this triggering event, along with subsequent alleged conduct by the NYCHA Defendants, gave rise to a hostile work environment.  Plaintiff alleges five primary sets of events in support of her claims:  (1) the July 30, 2015 meeting at which Defendant Mark-Viverito allegedly stated, "I want a Spanish manager," (Doc. 94, Pl.'s Opp. Mem. 13);[7] (2) Defendant Clarke's subsequent orders to Colon to terminate and replace Plaintiff based on allegedly discriminatory reasons, and demotion of Colon

---

Material Facts, filed January 17, 2020.  (Doc. 86.)

[4] In January 2015, NYCHA launched a property management model pilot program called the Optimal Property Management Operating Model ("OPMOM").  (Doc. 78, NYCHA R. 56.1 Statement ¶¶ 21, 24.)  The original 18 OPMOM developments were in Brooklyn, the Bronx, and Manhattan, and there was a Regional Asset Manager ("RAM") assigned to each borough.  (*Id.* ¶ 24.)  Mill Brook was one of the original 18 OPMOM developments.  (*Id.*)

[5] "Marcus Decl." refers to the declaration of Natalie Marcus in support of Defendant Mark-Viverito's motion for summary judgment, filed January 17, 2020.  (Doc. 87.)  "Williams Dep. Tr." refers to the transcript of the May 8, 2019 deposition of Plaintiff Allison Williams.  (*Id.*, Ex. G.)

[6] "NYCHA R. 56.1 Statement" refers to the NYCHA Defendants' Local Rule 56.1 Statement in support of the NYCHA Defendants' motion for summary judgment against Plaintiff Allison Williams, filed January 17, 2020.  (Doc. 78.)

[7] "Pl.'s Opp. Mem." refers to Plaintiff's memorandum of law in opposition to Defendants' motions for summary judgment, filed April 18, 2020.  (Doc. 94.)

for her failure to do so, (*id*. at 13–14); (3) an August 28, 2015 meeting with Defendant Clarke and other NYCHA employees, where Clarke, in a hostile manner, demanded to know from Plaintiff how she spoke to Spanish people, (*id*. at 6; Am. Compl. ¶ 30); (4) the NYCHA Defendants' failure to timely replace Plaintiff's housing assistants who had left Mill Brook in late 2015 to mid-2016, resulting in Plaintiff's workload increasing dramatically, (Pl.'s Opp. Mem. 7–8); and (5) the NYCHA Defendants' transfer and replacement of Plaintiff's Spanish-speaking superintendent with an underperforming employee in 2017, (*id*. at 8).

### A.  *July 30, 2015 Meeting at the Former Speaker's Office*

During the relevant time period, Defendant Mark-Viverito served as Council Speaker of the New York City Council.  (NYCHA R. 56.1 Statement ¶ 4.)  On July 1, 2015, Defendant Mark-Viverito's Office requested a meeting with NYCHA.  (Mark-Viverito R. 56.1 Statement ¶ 37; Marcus Decl., Ex. GG, Email from Sinnwell to Honan, dated July 1, 2015; *see also id.*, Ex. HH, Email from Honan to Clarke, dated July 29, 2015.)

Physically in attendance at the July 30, 2015 meeting were:  Plaintiff; Marcela Medina, State Legislative Affairs Officer in NYCHA's City and State Legislative Affairs Department; Brian Honan, Director of NYCHA Intergovernmental Special Legislative Affairs; James Artis, Regional Asset Manager ("RAM") for the Bronx in the Optimal Property Management Operating Model Program ("OPMOM"); Sybil Colon, Director of OPMOM; Princella Jamerson, Mill Brook Tenant Association President; Defendant Mark-Viverito; Diana Ayalau, from Mark-Viverito's Office; and Gloria Cruz, Mark-Viverito's constituent services liaison.  (Mark-Viverito R. 56.1 Statement ¶ 50; *see also id.* ¶¶ 17, 18, 19, 21, 36; Marcus Decl., Ex. H, Medina Dep. Tr. 20:17-21:4; 47:17-19; *id*., Ex. B, Colon Dep. Tr. 128:5-131:7; *id*., Ex. J, Mark-Viverito Dep. Tr.

15:25-18:8; *id.*, Ex. E, Clarke June 13, 2019 Dep. Tr. 40:15-20.)[8]  Defendant Clarke attended the meeting by telephone.  (NYCHA R. 56.1 Statement ¶ 46; *see also* Medina Dep. Tr. 21:16-18; Colon Dep. Tr. 131:8-9.)  Defendant Kelly did not attend the meeting.  (NYCHA R. 56.1 Statement ¶ 47; *see* Medina Dep. Tr. 21:19-21.)

During the meeting, Defendant Mark-Viverito asked Plaintiff how she was "handling [the] Spanish-speaking residents at Mill Brook Houses."  (Mark-Viverito R. 56.1 Statement ¶ 54; Williams Dep. Tr. 197:19-198:5; Am. Compl. at ¶ 17.)  Plaintiff and Artis responded that they used the NYCHA language bank, a tool that allowed employees to locate a Spanish-speaking person who could provide translation services over the telephone.  (Mark-Viverito R. 56.1 Statement ¶¶ 55, 59; Williams Dep. Tr. 198:6-199:9; Marcus Decl., Ex. I, Artis Dep. Tr. 30:5-11.)[9]  Defendant Mark-Viverito stated that it was unacceptable to use the language bank and carry out translation services telephonically, and that they needed a Spanish-speaking person at the office.  (Mark-Viverito R. 56.1 Statement ¶¶ 56, 60; Williams Dep. Tr. 292:10-293:9; Artis Dep. Tr. 30:13-17.)  Plaintiff explained that she would call Spanish-speaking Mill Brook superintendents or the supervisor of the caretakers to translate for her, which Defendant Mark-Viverito also called unacceptable.  (Mark-Viverito R. 56.1 Statement ¶ 58; Williams Dep Tr. 211:11-18; Colon Dep. Tr. 136:23-25.)  Around this point of the meeting, Defendant Mark-Viverito allegedly stated that she wanted a "Spanish manager," (Mark-Viverito R. 56.1 Statement ¶ 61; Colon Dep. Tr. 135:25-136:4); however, the accuracy of this statement is disputed by the NYCHA Defendants, who maintain that the phrase "Spanish manager" was

---

[8] "Medina Dep. Tr." refers to the transcript of the June 17, 2019 deposition of Marcela Medina.  (Marcus Decl., Ex. H.)  "Colon Dep. Tr." refers to the transcript of the January 9. 2019 deposition of Sibyl Colon.  (*Id.*, Ex. B.)  "Mark-Viverito Dep. Tr." refers to the transcript of the May 14, 2019 deposition of Melissa Mark-Viverito.  (*Id.*, Ex. J.)  "Clarke June 13, 2019 Dep. Tr." refers to the transcript of the June 13, 2019 deposition of Brian Clarke.  (*Id.*, Ex. E.)

[9] "Artis Dep. Tr." refers to the transcript of the April 9, 2019 deposition of James Artis.  (Marcus Decl., Ex. I.)

never uttered during the meeting, (*see* Doc. 77, NYCHA Defs.' Mem. 3).[10]  Plaintiff emphasizes

the tone of this exchange, alleging that Defendant Mark-Viverito "slammed her fist" on the table,

"said that she wanted a Spanish Manager about three times," and was "very hostile, very angry,"

and "screamed" that she wanted a Spanish Manager.  (Doc. 93, Pl.'s Resp. to Mark-Viverito R.

56.1 Statement ¶ 61;[11] *see* Colon Dep. Tr. 135:24-137:20.)  Regarding Defendant Mark-

Viverito's manner, Artis testified, "I can't say that she was yelling, but she was excited and

passionate about the fact that [the lack of a Spanish-speaking individual at Mill Brook] was

unacceptable and she was adamant about there should be a Spanish-speaking individual in the

office."  (Artis Dep. Tr. 30:20-23.)  He further stated that "her basic demeanor . . . wasn't nice."

(*Id*. at 34:12.)[12]

Colon suggested that NYCHA did not have a job title named "bilingual housing

manager" but did have bilingual housing assistants, and explained that having a bilingual

housing assistant at Mill Brook might be of assistance to Plaintiff because a bilingual housing

assistant would be able to speak Spanish.  (Mark-Viverito R. 56.1 Statement ¶¶ 67, 68; Colon

Dep. Tr. 136:6-11; 146:2-7; *see also* Doc. 82, Clarke Decl. ¶ 20.)[13]  Colon offered to contact

human resources to try to put in place a bilingual housing assistant line at Mill Brook.  (Def.

Mark-Viverito's R. 56.1 Statement ¶ 70; Colon Dep. Tr. 136:13-16.)  According to Plaintiff, and

---

[10] "NYCHA Defs.' Mem." refers to the NYCHA Defendants' memorandum of law in support of their motion for summary judgment, filed January 17, 2020.  (Doc. 77.)

[11] "Pl.'s Resp. to Mark-Viverito R. 56.1 Statement" refers to Plaintiff's Response to Defendant Melissa Mark-Viverito's Local Rule 56.1 Statement, filed April 18, 2020.  (Doc. 93.)

[12] Defendants do not contest Plaintiff's and Artis's characterization of Defendant Mark-Viverito's demeanor during the meeting, but argue that neither "angry words and gestures, in and of themselves," (Doc. 100, NYCHA Defs.' Reply 5), nor "[n]ot being 'nice,'" (Doc. 99, Def. Mark-Viverito's Reply 4), suffice to establish a hostile work environment.

[13] "Clarke Decl." refers to the declaration of Brian Clarke in support of the NYCHA Defendants' motions for summary judgment against Plaintiffs Sibyl Colon and Allison Williams, filed January 17, 2020.  (Doc. 82.)

undisputed by Defendants, these recommendations were also rejected by Defendant Mark-Viverito.  (Pl.'s Opp. Mem. 3; *see* Artis Dep. Tr. 33:10-13.)  The NYCHA Defendants explain that "NYCHA could not create a new, budgeted position at Mill Brook for a bilingual Housing Assistant; there had to be a vacancy in the position . . . [which] would then have been the responsibility of the Mill Brook Houses Property Manager or Regional Asset Manager to request a bilingual Housing Assistant to fill."  (NYCHA R. 56.1 Statement ¶ 60; Clarke Decl. ¶ 21.)

Later during the meeting, Colon asked if there were any complaints about Plaintiff.  (Mark-Viverito R. 56.1 Statement ¶ 74.)  Gloria Cruz, Defendant Mark-Viverito's constituent services liaison, responded that there was a complaint by a resident concerning a non-functioning refrigerator.  (*Id.* ¶ 75.)[14]

Defendants point to contextual evidence to support their claim that the objective of the July 30, 2015 meeting was to address language barriers between NYCHA and the Spanish-speaking residents of the Mill Brook Houses.  Leading up to the meeting, Defendant Mark-Viverito testified that she had received complaints from constituents that their needs were not being met, and that her purpose for calling the meeting was "to find out from NYCHA what they were doing to address the concerns of the Spanish-speaking residents of Mill Brook houses."  (Mark-Viverito Dep. Tr. 15:14-20; 18:16-18.)  Plaintiff disputes the substance of the alleged complaints on the basis that Mark-Viverito's Office, when asked to produce all copies of complaints relating to the Mill Brook Houses, provided "no foundation for any such complaints, except one document."  (Pl.'s Resp. to Mark-Viverito R. 56.1 Statement ¶¶ 39–44; 71–73; 85; *see* Doc. 79, Lippman Decl., Ex. 22, Email from Vega to Taylor, Williams and others, dated

---

[14] On August 7, 2015, the Bronx Borough President's office forwarded to Colon the relevant July 28, 2015 inquiry concerning a young mother with a five-month-old daughter who did not have a working refrigerator.  Colon asked Plaintiff to respond to the email.  (Mark-Viverito R. 56.1 Statement ¶ 116; Marcus Decl., Ex. LL, Email from Colon to Williams, dated August 7, 2015.)

October 30, 2014.)[15]  The document in question is an October 30, 2014 email sent by Cruz to

Sylvia Vega, NYCHA Principal Administrative Associate for State and City Legislative Affairs,

reporting that a Mill Brook resident had complained to Mark-Viverito's Office that "[e]very time

[the resident] goes to the [Mill Brook] office he feels like he's being bullied by management

because he cannot speak English.  This issue is making him sick and upset please can you help

us with this issue."  (*Id.*; *see also* NYCHA R. 56.1 Statement ¶ 28.)  Vega forwarded Cruz's

email to other NYCHA employees, including Plaintiff.  (*See* Lippman Decl., Ex. 22.)  Attached

to the email is a list of thirteen open complaints sent to Mark-Viverito's Office by Mill Brook

residents relating to unfulfilled maintenance requests.  (*See id.*)

 The record demonstrates that several NYCHA employees were alerted to alleged

complaints about Plaintiff's performance as Manager of Mill Brook.  On May 14, 2015, Brian

Honan, the Director of State and City Legislative Affairs for NYCHA and Medina's supervisor,

emailed Chair Shola Olatoye, stating,

> The manager at Mill Brook is making it very difficult for [Defendant Mark-Viverito] to support OPMOM.  Yesterday I heard from three of her staff members who complained about a recent meeting at the development.  The manager told residents that OPMOM makes it easier for her to evict tenants, so people need to pay their rent (she said that she would evict people for owing as little as 35 dollars); and she make [sic] a very insensitive remark about Spanish[-]speaking residents.

(NYCHA R. 56.1 Statement ¶ 30; Lippman Decl., Ex. 21, May 14, 2015 Email Chain between

Honan and Olatoye.)  The Chair copied Defendant Kelly on her reply to Honan, with the remark

that the "GM"—presumably in reference to General Manager Kelly—"plans to visit all NGN

sites asap.  Clearly, needs to start with this one."  (*See id.*)  Other employees testified that they

had heard that Plaintiff had made derogatory remarks about Spanish-speaking residents.

---

[15] "Lippman Decl." refers to the declaration of Jane E. Lippman in support of the NYCHA Defendants' motion for summary judgment against Plaintiff Allison Williams, filed January 17, 2020.  (Doc. 79.)

Specifically, Medina testified that she learned from one of Defendant Mark-Viverito's staff members, Diana Ayala, that during a tenant association meeting, Plaintiff told the Mill Brook residents that she did not want to hear any "mira mira talk."  (Doc. 80, Medina Decl. ¶ 4.)[16] Defendant Clarke testified that he had also heard secondhand from Honan that Plaintiff had made this statement.  (Clarke Decl. ¶ 19; Clarke June 13, 2019 Dep. Tr. at 136:8-10.)  Plaintiff denies that this comment was made and contests that Honan's underlying reference to the alleged derogatory remark was never confirmed by NYCHA.  (Doc. 95, Pl.'s Resp. to NYCHA R. 56.1 Statement ¶¶ 29, 30;[17] Williams Dep. Tr. 159:7-159:18.)  Plaintiff was also not copied on the email from Honan.  (*See* Lippman Decl., Ex. 21.)

On July 1, 2015, Honan emailed Defendant Clarke and Luis Ponce, NYCHA Senior Vice President of Operations, regarding the anticipated July 30, 2015 meeting with Defendant Mark-Viverito, foreshadowing, "this will not be a good meeting as they've expressed their unhappiness with the manager in the past."  (*See* Marcus Decl., Ex. GG, Email from Honan to Clarke and Ponce, dated July 1, 2015.)  In contrast, Plaintiff and Colon both claim that they did not know of the Mill Brook residents' complaints or the purpose of the meeting with the Former Speaker in advance of the meeting.  (Colon Dep. Tr. 118:17-119:8, 121:17-122:14, 124:14-17; Williams Dep. Tr. 190:16-191:8.)

Defendants produced notes taken by Medina during the July 30, 2015 meeting in support of their contention that the focus of the meeting was to address language barriers at Mill Brook. (Marcus Decl., Ex. JJ, Medina Notes, dated July 30, 2015; *see* Mark-Viverito R. 56.1 Statement

---

[16] "Medina Decl." refers to the declaration of Marcela Medina in support of the NYCHA Defendants' motions for summary judgment against Plaintiffs Sibyl Colon and Allison Williams, filed January 17, 2020.  (Doc. 80.)

[17] "Pl.'s Resp. to NYCHA R. 56.1 Statement" refers to Plaintiff's Response to the NYCHA Defendants' Local Rule 56.1 Statement, filed April 18, 2020.  (Doc. 95.)

¶ 86; Medina Dep. Tr. 43:15-44:10.)  Included in Medina's notes are comments that "staff is very rude," "management must at least represent the language," and "follow-up[:] see about hiring a Spanish speaker."  (Marcus Decl., Ex. JJ.)  On July 31, 2015, the day after the meeting, Medina emailed her colleague, Jennifer Montalvo, reporting that the meeting "went okay— speaker was very upset, the insult things didn't come up but she wants us to address the language barrier issue."  (Marcus Decl., Ex. CCC, Email from Medina to Montalvo, dated July 31, 2015.) Medina informed Montalvo that "it['] a bit complicated with the [Tenant Association President for Mill Brook, Princella Jamerson] and what not but the idea is to bring a housing assistant who can speak [S]panish."  (*Id.*; *see* Medina Dep. Tr. 35:10-18.)

**B.** ***Defendant Clarke's Directions to Replace Plaintiff and the August 28, 2015 Meeting***

Defendant Clarke was NYCHA's Senior Vice President of Operations for Property Management.  (NYCHA R. 56.1 Statement ¶ 3.)  Defendant Clarke reported to Defendant Kelly, who was the General Manager of NYCHA from 2015 to 2018.  (*Id.* ¶¶ 2, 3.)  After the meeting at Defendant Mark-Viverito's office, Clarke discussed transferring Plaintiff out of the OPMOM program with Kelly.  (Mark-Viverito R. 56.1 Statement ¶ 102; Clarke June 13, 2019 Dep. Tr. 140:24-25.)  Pursuant to Plaintiff's civil service title as a property manager, she could be transferred at the discretion of management.  (Mark-Viverito R. 56.1 Statement ¶ 104; *see* Clarke June 13, 2019 Dep. Tr. 145:24-146:2; Colon Dep. Tr. 104:11-14.)  When NYCHA transfers a housing manager to another development, the employee does not lose seniority, and her salary remains the same.  (NYCHA R. 56.1 Statement ¶ 107.)  Defendant Clarke testified that he did not have the authority to transfer Plaintiff himself, but could recommend her transfer to General Manager Kelly and human resources.  (Clarke June 13, 2019 Dep. Tr. 139:22-140:14.) Defendant Kelly did not object to Clarke's recommendation of transferring Plaintiff out of Mill

Brook.  (Mark-Viverito R. 56.1 Statement ¶ 103; Clarke June 13, 2019 Dep. Tr. 141:6-9.)

Regarding the motivations for his attempt to transfer Plaintiff, Defendant Clarke testified that neither Defendant Mark-Viverito, nor anyone at the July 31, 2015 meeting, requested that he remove Plaintiff as Manager of Mill Brook.  (Clarke June 13, 2019 Dep. Tr. 136:19-24.)  He testified that he wanted to transfer Plaintiff out of the OPMOM program, thereby moving her from Mill Brook to a different location, for the stated reason that she "was not a good manager." (*Id*. at 137:18-138:2.)  In Clarke's words,

> [Plaintiff's] performance, certainly while I was involved with the program, was not good.  She was never prepared for meetings, she never had a corrective action plan for whatever the issue was, and frankly I just thought it was just unbelievable that a property manager would ridicule tenants because of their inability to speak English, and violate a Mayoral order for language access for city services at a public meeting.  That was the straw that really kind of broke the camel's back for me.  This program, the Optimal Property Management Program, was supposed to be the vanguard of how we were going to change the way that we were going to manage our properties.  Customer service, resident engagement was a key part of that, and for a manager to tell somebody who is limited English-speaking that, you know, don't communicate with me, you know, at a public meeting, that was just it for me, and I wanted to have her removed from the program and then also disciplined for what she did at that meeting.

(*Id*. at 138:2-21.)  Plaintiff disputes the reason put forth by Defendant Clarke for his attempt to transfer her.  (Pl.'s Resp. to Mark-Viverito R. 56.1 Statement ¶¶ 102, 103.)  However, Plaintiff does not dispute the evidence raised by Defendants of her disciplinary record, namely, that:  (1) on August 3, 2009, Plaintiff entered into a Local Hearing Settlement Agreement whereby she agreed to a loss of two days of annual leave in exchange for the dismissal of three charges for failure to perform her duties; (2) on January 20, 2015, Plaintiff was served with three charges of incompetency and/or misconduct and subsequently found guilty of two of the charges; and (3) Plaintiff was subject to numerous counseling memoranda in the years 2007, 2008, 2009, 2011, 2012, 2013, and 2014.  (Pl.'s Resp. to Mark-Viverito R. 56.1 Statement ¶¶ 22, 23, 24, 26.)

On July 31, 2015, Defendant Clarke held a meeting with Colon, where he asked Colon to work with the Human Resources Department to transfer Plaintiff out of Mill Brook because he could not do so because he was going on vacation.  (Mark-Viverito R. 56.1 Statement ¶¶ 105, 106; Colon Dep. Tr. 160:20-161:22.)  Clarke directed Colon to contact Kenya Salaudeen, NYCHA Director of Human Resources, to effectuate Plaintiff's transfer out of Mill Brook. (Mark-Viverito R. 56.1 Statement ¶ 107; Colon Dep. Tr. 161:10-12; *see* Clarke June 13, 2019 Dep. Tr. 49:7-9.)  Colon testified that Clarke told her not to use the words "Spanish Manager" when speaking to Salaudeen, (Colon Dep. Tr. 161:10-16), but instead to tell Salaudeen that Plaintiff's transfer was necessary due to the "cultural sensitivity needs" of the Mill Brook development.  (Mark-Viverito R. 56.1 Statement ¶ 109; Colon Dep. Tr. 161:13-15.)  Colon testified that she called Salaudeen the following week to tell her that Clarke had directed her to transfer Plaintiff out of Mill Brook and replace her with a Hispanic manager.  (*See* Colon Dep. Tr. 166:1-167:3.)  According to Colon, Salaudeen then "raised her voice" and said, "I'm offended by what you're saying to me as a Black woman.  (*Id*. at 167:16-17.)  Colon replied, "Look, Mr. Clarke wants it done.  Brian said to tell you that Melissa [Mark-]Viverito wants it done.  It has to be and Mr. Kelly wants it done."  (*Id*. at 167:18-22.)  At this point of the conversation, Salaudeen apparently took offense and told her, "I don't care if Obama wants it done, it's illegal and you can be sued."  (*Id*. at 167:22-24.)  Colon claims that Salaudeen elaborated that it was "illegal to make race-based transfers."  (*Id*. at 169:17-18.)  However, Salaudeen states that she has no recollection of having a conversation with Colon "with respect to removing Allison Williams as the manager of Mill Brook Houses."  (Marcus Decl., Ex. M, Salaudeen Dep. Tr. 25:16-22).[18]  Colon testified that, shortly after her call with Salaudeen, she

---

[18] "Salaudeen Dep. Tr." refers to the transcript of the June 20, 2019 deposition of Kenya Salaudeen.  (Marcus Decl.,

had a follow-up telephone conversation with Richard Bernardo, the Deputy Director of Human

Resources under Salaudeen, and Human Resources employee Marla Edmondson.  (Colon Dep.

Tr. 170:5-22, 172:19-173:22.)  Once Colon articulated to Edmondson and Bernardo that she was

instructed to replace Plaintiff with a Hispanic manager, she testified that they both also told her

that it was illegal to do so.  (*Id*. at 174:1-4, 174:22-24.)  Edmondson recalls discussing removing

Plaintiff from Mill Brook with Colon, "[i]n reference to something that happened at a meeting."

(*Colon v. New York City Housing Authority*, No. 16-cv-4540, Doc. 131-14, Edmondson Dep. Tr.

10:24-11:18.)[19]  She also recalls discussing Plaintiff's removal with Bernardo.  (*Id*. at 40:7-14.)

Edmondson further testified that Human Resources told Colon that the transfer could not be

done, because Human Resources had no information in Plaintiff's file, including her "complete

disciplinary history," that would legitimate her transfer from Mill Brook, specifically,

"counseling memos . . . [or] any information that they could tell us about the employee

performing poorly at that location."  (*Id*. at 12:5-24; 44:20-24.)  However, Edmondson denies

telling Colon that the directive to remove Plaintiff was discriminatory or illegal.  (*Id*. at 13:20-

14:3.)  Neither Plaintiff nor Defendants have produced any notes or memoranda documenting

Colon's conversations with Human Resources.

        During the following month, NYCHA employees made various inquiries concerning the

status of Colon's task.  On August 6, 2015, Sheila Pinckney, Senior Advisor at NYCHA's Office

of the SVP Operations, sent Colon an email asking on Clarke's behalf whether the "move [was]

completed" "regarding the Property Manager at Mill Brook Houses."  (Mark-Viverito R. 56.1

Statement ¶ 113; Marcus Decl., Ex. KK, Email from Pinckney to Colon, dated August 6, 2015.)

---

Ex. M.)

[19] "Edmondson Dep. Tr." refers to the transcript of the April 23, 2019 deposition of Marla Edmondson.  (*Colon v. New York City Housing Authority*, No. 16-cv-4540, Doc. 131-14.)

Colon responded that "HR needs more information from us.  There is also is an ig [Inspector General] investigation going on.  HR wants to talk to the ig's office first."  (*Id*.; Mark-Viverito R. 56.1 Statement ¶ 114.)  On August 12, 2015, Colon emailed Clarke to report that she was "experienc[ing] difficulty with the transferring of the Manager at Mill Brook.  HR is requesting information I am unable to provide. . . . We reached out to the local political office where we had the meeting at and they did not provide complaint documentation or specifics."  (Mark-Viverito R. 56.1 Statement ¶ 117; Marcus Decl., Ex. MM, Email from Colon to Clarke, dated August 12, 2015.)

Colon went on vacation from Monday, August 17, 2015 through Sunday, August 23, 2015; within days of her return on August 25, 2015, Clarke emailed her to ask, "Where are we with moving the manager from Millbrook?"  (Mark-Viverito R. 56.1 Statement ¶¶ 118, 119; Marcus Decl., Ex. NN, Email from Clarke to Colon, dated August 25, 2015; Colon Dep. Tr. 212:1-3.)  Colon responded, "HR informed me that we needed more specific information in reference to the cultural needs of the residents, in order to transfer the Manager at Mill Brook." (Mark-Viverito R. 56.1 Statement ¶ 120; Marcus Decl., Ex. OO, Email from Colon to Clarke, dated August 25, 2015.)  Colon told Clarke: "I forwarded HR the development's resident population data and was informed that this was not enough information.  I also contacted the political office where we had the meeting at and they stated they only had one repair complaint for this Manager.  This information was also shared with HR."  (*Id*.)

On August 28, 2015, Plaintiff, Defendant Clarke, Colon, Ponce, Melania Allen, NYCHA Director of Bronx Property Management, Artis, and other managers attended a monthly meeting for OPMOM developments in the Bronx.  (Mark-Viverito R. 56.1 Statement ¶¶ 121, 122, 124, 128; Williams Dep. Tr. 233:13-15; 236:6-237:10.)  At this meeting, Defendant Clarke allegedly

14

questioned Plaintiff about Mill Brook "stats" and asked how she spoke to the Spanish-speaking

Mill Brook tenants.  (Williams Dep. Tr. 243:10-244:13; Mark-Viverito R. 56.1 Statement ¶ 125.)

Plaintiff testified that, at this meeting, Clarke "asked [her] about the Spanish Speaking thing" in

a "nasty" manner in front of her coworkers.  (Williams Dep. Tr. 238:10-22.)  At the same

meeting, Colon announced her resignation.  (*Id*. at 244:25-245:7; Mark-Viverito R. 56.1

Statement ¶ 128.)  Artis corroborates that Clarke was "kind of rough with [Plaintiff]" and "talked

to her, like, with contempt."  (Artis Dep. Tr. 49:16-20.)  Defendant Clarke disputes attending this

meeting, let alone asking Plaintiff how she spoke to Spanish-speaking residents on this date, but

testifies that this was indeed the day that Colon resigned.  (Clarke. Decl. ¶ 23.)  The NYCHA

Defendants claim that there is no record of a meeting with Clarke occurring on August 28, 2015,

(NYCHA R. 56.1 Statement ¶ 180), and no such documents have been produced by any of the

parties.

Defendant Clarke's alleged attempt in 2015 to have Plaintiff transferred out of Mill

Brook was unsuccessful.  According to Defendant Clarke, the transfer did not occur "because it

was recommended to me [by the Law Department] not to transfer at this time."  (Clarke June 13,

2019 Dep. Tr. 146:7-11.)  Plaintiff retired from NYCHA almost two years after the July 30, 2015

meeting, after 33 years of service.  (Mark-Viverito R. 56.1 Statement ¶ 9.)  When Plaintiff

retired, she held the position of Mill Brook manager.  (Mark-Viverito R. 56.1 Statement ¶ 8.)

### C.  *Unfilled Housing Assistant Vacancies*

Mill Brook was allocated four housing assistants ("HAs").  (Mark-Viverito R. 56.1

Statement ¶ 130; Williams Dep. Tr. 93:21-23.)  Plaintiff alleges in her Amended Complaint that,

as the manager of the Mill Brook Houses, she had historically always been assigned at least four

housing assistants, and the volume of work at Mill Brook required that number of assistants.

(Am. Compl. ¶ 24.)  Plaintiff claims that, following Colon's resignation on August 28, 2015, NYCHA Defendants deliberately neglected to replace or timely replace the four Mill Brook HAs that had left for various reasons.  (Pl.'s Opp. Mem. 6–7.)  In Plaintiff's view, the NYCHA Defendants' failures to timely replace the HAs were part of an "orchestrated effort to deprive Plaintiff of essential personnel at Mill Brook, setting her up to fail so that they could justify removing her as manager, pursuant to Council Speaker's request."  (*Id.* at 6.)

On October 6, 2015, after requesting a transfer, Mill Brook HA Rebecca Iyanda was instructed to report to a different housing program, and in November 2015, was administratively transferred and replaced with HA Celeste Mangum.  (Mark-Viverito R. 56.1 Statement ¶¶ 132–35; Williams Dep. Tr. 70:12-22; 77:7-12; Marcus Decl., Ex. RR, November 12-18, 2015 Email Chain between Lee, Artis, and others.)  In January 2016, Plaintiff sought and procured HA Mangum's termination.  (*See* Mark-Viverito R. 56.1 Statement ¶¶ 137, 138; Marcus Decl., Ex. SS, January 5-7, 2016 Email Chain between Williams and Edmonson; *id.*, Ex. TT, Email from Roman to Williams, dated January 22, 2016; Williams Dep. Tr. 81:23-25, 82:16-18.)

On December 28, 2015, HA Tamika Powell, who had been working at Mill Brook, was promoted to Assistant Housing Manager at the Marble Hill Houses, leaving a vacancy at Mill Brook.  (Mark-Viverito R. 56.1 Statement ¶ 142; Marcus Decl., Ex. PP, Email from Fuller to Williams and others, dated December 11, 2015.)

A third HA, Tina McLain, took leave pursuant to the Family Medical Leave Act ("FMLA") from October 22, 2015 through December 24, 2015.  (Mark-Viverito R. 56.1 Statement ¶ 141; Marcus Decl., Ex. UU, Email from Roberson to Williams, dated December 4, 2015.)  Plaintiff alleges that upon McLain's return from leave, NYCHA transferred her out of Mill Brook without explanation.  (Williams Dep. Tr. 227:20-229:8.)

16

Finally, in December 2015, HA Hafiz experienced a death in her family, (Mark-Viverito R. 56.1 Statement ¶ 139), and according to Plaintiff, did not come to work, (Pl.'s Opp. Mem. 8). She eventually returned to work. (Mark-Viverito R. 56.1 Statement ¶ 140; Williams Dep. Tr. 59:3-60:5.)

Therefore, for a period in December 2015, it is undisputed Mill Brook had at least two HA vacancies, (Mark-Viverito R. 56.1 Statement ¶ 146; *see also* Marcus Decl., Ex. VV, Email from Washington to Williams, dated December 29, 2015), although Plaintiff contends that all four positions were unfilled at that time, (Lippman Dec., Ex. 1, ¶¶ 24–27).[20]  Plaintiff admits that it was her responsibility to notify human resources of vacant housing positions through the submission of a PD2 form to the Human Resources Department. (Mark-Viverito R. 56.1 Statement ¶ 145; *see* Williams Dep. Tr. 93:17-20.)

Plaintiff instructed her assistant, Fredericka Dilworth, to contact NYCHA Management to replace her HAs. (Am. Compl. ¶ 26; *see id.*, Ex. A.) According to Plaintiff's testimony, Artis, as RAM, was "the one who decides when you need people, that is who you go to. He is our boss." (Williams Dep. Tr. 305:5-306:17.) Thereafter, Dilworth sent several emails to NYCHA Management about the HA situation at Mill Brook. On October 27, 2015, Dilworth emailed Artis that Mill Brook was "in dire need of another housing assistant" to "help get this work done." (Am. Compl., Ex. A, at 1.) Dilworth reported that they were "currently working with one permanent housing assistant, and one housing assistant who was sent from Patterson . . . who has never had any training. I have 2 housing assistants out sick since last week, and the other is

---

[20] Plaintiff's Amended Complaint accounts for the alleged four HA vacancies as follows: "[one] housing assistant[] was removed, and never replaced; [one] went on FMLA leave, and never replaced; [one] was transferred to the Marble Hills projects, and never replaced; and the last one, unfortunately, had a death in her family and unavailable the majority of the time." (Am. Compl. ¶ 25.) The HA who went on FMLA leave was McClain, and the HA who was transferred to Marble Hill Houses due to a promotion was Powell. (NYCHA Defs.' R. 56.1 Statement ¶ 141.) Plaintiff does not know the identity of the other two HAs. (*Id.*)

working as much as she possibly can." (*Id.*)  Dilworth emailed Artis again on November 12, 2015, requesting a HA to temporarily assist Mill Brook with completing annual reviews. (*Id.* at 2.)  On December 15, 2015, Dilworth sent Artis another email requesting "at least one (if not two) housing assistants." (*Id.* at 3.)  She reported in this email that since McLain was "out on FMLA," Powell was "preparing for promotion to Marble Hill in less than two weeks," and Mangum had "a serious time and attendance issue," she was "basically working with one housing assistant." (*Id.*)

On December 29, 2015, Gwendolyn Washington, a Department of Management and Planning Secretary, emailed Plaintiff, instructing that "[y]our location needs to submit the PD2s for [Powell and McClain] because they are no longer working at your location.  You are budget[ed] for [four], but you only have [two] at this present time." (Marcus Decl., Ex. VV, Email from Washington to Williams, dated December 29, 2015.)  On December 30, 2015, Dilworth emailed Artis, stating, "I literally have no staff. . . . I am in need of housing assistants." (Am. Compl., Ex. A, at 4.)  Plaintiff testified that her secretary did not timely complete the PD2s, and while the forms were eventually submitted, she did not know how long it took to submit them. (Williams Dep. Tr. 142:20-23; 144:5-12.)  On January 26, 2016, a PD2 form was submitted seeking a housing assistant for Mill Brook and the request was fully approved on February 4, 2016. (Mark-Viverito R. 56.1 Statement ¶ 147; Marcus Decl., Ex. WW, Email from Washington to Williams and Roman, dated February 8, 2016.)

In early February 2016, shortly after the PD2 request for a Mill Brook HA was submitted, Plaintiff received two emails from Human Resources notifying her that the automated transfer list service (ATLS) cataloguing NYCHA employees seeking transfers had been "created or updated for a vacancy / vacancies in [her] location," and prompting her to select an HA from the

list.  (Lippman Decl., Ex. 32, Emails from ATLS Admin to Williams and others, dated February 2 and February 9, 2016.)  On February 5, 2016, interviews were scheduled for February 18, 2016 for Mill Brook housing assistants.  (Mark-Viverito R. 56.1 Statement ¶ 148; *see* Marcus Decl., Ex. XX, Email from Walker to Williams and others, dated February 5, 2016.)  On February 29, 2016, HA Ahmed Ajani was transferred to Mill Brook.  (Mark-Viverito R. 56.1 Statement ¶ 149; *see* Marcus Decl., Ex. YY, Email from Jackson to Williams and others, dated February 16, 2016; Williams Dep. Tr. 112:5-12.)  On March 1, 2016, NYCHA transferred HA Alice Coutrier out of Patterson Houses to Mill Brook after a resident of Patterson Houses had threatened to kill her. (Mark-Viverito R. 56.1 Statement ¶¶ 152, 153; *see* Marcus Decl., Ex. ZZ, Email from Fanniel to Abrahams and others, dated February 12, 2016; *id*., Ex. AAA, Email from Roman to Edmondson and others, dated March 1, 2016.)  Plaintiff was dissatisfied with Coutrier's performance and initiated her termination.  (Mark-Viverito R. 56.1 Statement ¶¶ 154, 155; Williams Dep. Tr. 128:22-129:7.)  In September 2016, another housing assistant, Kristina Smith, was assigned to Mill Brook.  (Mark-Viverito R. 56.1 Statement ¶ 150; NYCHA R. 56.1 Statement ¶ 166; Williams Dep. Tr. 125:14-17; Lippman Decl., Ex. 35, Email from Walker to Williams and others, dated August 26, 2016.)

With respect to the putative delays in filling the Mill Brook HA vacancies, Plaintiff states that she never saw a document that represented that OPMOM developments would never be understaffed, and she does not know whether other OPMOM developments always had their desired numbers of staff.  (NYCHA R. 56.1 Statement ¶ 169; Williams Dep. Tr. 137:17-138:25.) Plaintiff in fact speculated that NYCHA's failure to replace her staff quickly was a result of the inefficiencies of the OPMOM pilot program in general, and that this was a program-wide issue

that occurred "all over the place," not merely at Mill Brook.  (Williams Dep. Tr. 150:4-14.)[21]

Without knowing how long it took to replace staff at other developments, Plaintiff bases her

claim that NYCHA failed to replace the HAs in Mill Brook in a timely fashion on the notion that

"the OPMOM program operated under the principle that each development should be fully

staffed."  (Pl.'s Resp. to NYCHA R. 56.1 Statement ¶ 167.)

### D.  *Transfer of Plaintiff's Spanish-Speaking Superintendent*

Plaintiff alleges, in her opposition to Defendants' motions to dismiss, that in early 2017,

the NYCHA Defendants transferred her Spanish-speaking superintendent Ralph Martinez out of

Mill Brook, and replaced him with an underperforming assistant superintendent named Limo

who had previously been placed on probation due to his refusal to work.  (Pl.'s Opp. Mem. 8; *see*

*also* Williams Dep. Tr. 266:10-270:19.)  Plaintiff alleges that Martinez had been indispensable to

her management team, and that his substitute's performance was deficient.  (*See* Pl.'s Opp. Mem.

8.)  Plaintiff surmises that Martinez's transfer was part of the NYCHA Defendants' scheme to

"[set] her up to fail so that they could remove her from Mill Brook, and potentially, terminate her

employment."  (*Id.*)  Plaintiff resigned from NYCHA two weeks after HA Limo arrived Mill

Brook, "as she was highly stressed, could not do her work with zero [] staff, and . . . suspected

that NYCHA Defendants were setting her up to fail so they [could] either remove, or terminate,

her from Mill Brook."  (*Id.* at 8–9.)

### II.  **Procedural History**

On October 19, 2016, Plaintiff commenced this action, alleging the following causes of

---

[21] Artis testified that he did "eventually" provide Plaintiff with the requested HA replacements, and explained that staffing the various OPMOM developments "felt like . . . you just had to keep fishing around until you got a good fit on the employees from the pool that we had," and that "we would move staff to other developments and try to mix and match to see if we could get a good fit that was productive.  That's what we were trying to do."  (Artis Dep. Tr. 19:15-19, 22:6-15.)

action:  (1) creation of a hostile work environment based on race and national origin, in violation of the NYSHRL ("First Claim"); (2) creation of a hostile work environment based on race and national origin, in violation of the NYCHRL ("Second Claim"); (3) aiding and abetting violations of the NYSHRL, in violation of § 296(6) of the NYSHRL ("Third Claim"); (4) aiding and abetting violations of the NYCHRL, in violation of § 8-107(6) of the NYCHRL ("Fourth Claim"); (5) conspiracy to deprive Plaintiff of her constitutional rights, in violation of 42 U.S.C. § 1985 ("Fifth Claim"); (6) deprivation of Plaintiff's constitutional rights, in violation of 42 U.S.C. § 1983 ("Sixth Claim"); (7) creation of a hostile work environment based on race, in violation of 42 U.S.C. § 1981 ("Seventh Claim"); (8) violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution ("Eighth Claim"); and (9) intentional infliction of emotional distress ("IIED"), in violation of the laws of the state of New York ("Ninth Claim").  (Doc. 1, ¶¶ 38–68.)

On October 28, 2016, Plaintiff filed an Amended Complaint alleging identical facts and causes of action.  (*See* Am. Compl.)  On September 10, 2018, I granted in part Defendants' motion to dismiss the Amended Complaint, and dismissed all claims against the City of New York; the claims for hostile work environment under the NYSHRL and the NYCHRL, violations of Sections 1985, 1983, 1981, Fourteenth Amendment Equal Protection, and IIED against the Former Speaker; the claims for violations of Sections 1985, 1983, 1981, Fourteenth Amendment Equal Protection, and IIED against NYCHA; and the claim for violations of Section 1985 and IIED against Clarke and Kelly.  (Doc. 34.)  The following claims survived:  (1) the First and Second Claims under the NYSHRL and NYCHRL against Defendants NYCHA, Clarke, and Kelly; (2) the Third and Fourth Claims for aiding and abetting violations of the NYSHRL and NYCHRL against Defendants Mark-Viverito, NYCHA, Clarke, and Kelly; and (3) the Sixth,

Seventh, and Eighth Claims under Section 1983, Section 1981, and the Equal Protection Clause of the Fourteenth Amendment against Defendants Clarke and Kelly.

On November 2, 2018, I consolidated this case with *Colon v. New York City Housing Authority, et al.*, No. 16-cv-4540, for pretrial purposes. (*See* Doc. 45.)

On January 17, 2020, the NYCHA Defendants and Defendant Mark-Viverito moved for summary judgment to dismiss Plaintiff's Amended Complaint, along with statements of material facts pursuant to Local Civil Rule 56.1. (Docs. 76–83, 84–87.) Plaintiff filed a memorandum of law opposing Defendants' motions on April 18, 2020, (Doc. 94), as well as counterstatements to Defendant Mark-Viverito's and the NYCHA Defendants' Rule 56.1 Statements, (Docs. 93, 95). The NYCHA Defendants and Defendant Mark-Viverito filed their respective replies on May 15, 2020. (Docs. 100, 99.)

### III.   <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at

256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).  However, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial

evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted). This is so because "employers are rarely so cooperative as to include a notation in the personnel file that the [alleged discriminatory conduct] is for a reason expressly forbidden by law." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks omitted). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), and "may not 'rely on mere speculation or conjecture as to the true nature of the facts.'" *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). "[W]hen an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Risco v. McHugh*, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) (quoting *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010)).

## IV.    <u>Discussion</u>

The NYCHA Defendants move for summary judgment on all of Plaintiff's remaining claims for relief, i.e., hostile work environment and aiding and abetting hostile work environment against NYCHA under the NYSHRL and the NYCHRL; hostile work environment under the NYSHRL, the NYCHRL and 42 U.S.C. § 1981 against Kelly and Clarke; aiding and abetting a hostile work environment under the NYSHRL and the NYCHRL against Kelly and Clarke; and denial of equal protection under 42 U.S.C. § 1983 based on a hostile work environment against Kelly and Clarke. (NYCHA Defs.' Mem. 1.) Defendant Mark-Viverito

moves for summary judgment on Plaintiff's claims for aiding and abetting violations of the NYSHRL and NYCHRL.  (Doc. 85, Def. Mark-Viverito Mem. 2.)[22]

As none of the Defendants can be found liable for aiding and abetting a hostile work environment absent a showing of liability as to the principal in the first instance, I will first address the primary hostile work environment claims against the NYCHA Defendants.

## A. *Hostile Work Environment Claims (Counts One and Two against the NYCHA Defendants, and Six, Seven, and Eight against Defendants Clarke and Kelly)*

### 1. Applicable Law

Underlying each of Plaintiff's claims is the allegation that Defendants contributed to a hostile work environment.  To establish the existence of a hostile work environment under Section 1981, Section 1983, and the NYSHRL, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Lenart v. Coach, Inc.*, 131 F. Supp. 3d 61, 66 (S.D.N.Y. 2015) (applying same standard under NYSHRL); *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) ("The standard for showing a hostile work environment under Title VII, Section 1981, Section 1983, and the [NYSHRL] is essentially the same.").  To survive a motion for summary judgment, a plaintiff who alleges hostile work environment claims must plead sufficient facts allowing a jury "to conclude that the work environment both objectively was, and subjectively was perceived by

---

[22] "Def. Mark-Viverito's Mem." refers to Defendant Mark-Viverito's memorandum of law in support of her motion for summary judgment, filed January 17, 2020.  (Doc. 85.)

the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse."
*Schiano*, 445 F.3d at 604.  The objective and subjective components include that "the conduct
complained of must be severe or pervasive enough that a reasonable person would find it hostile
or abusive, and the victim must subjectively perceive the work environment to be abusive."
*Littlejohn*, 795 F.3d at 321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).  A
subjective perception that the work environment was hostile is necessary but not alone sufficient.
Accordingly, the "mere utterance of an epithet which engenders offensive feelings in [an]
employee does not sufficiently affect the conditions of employment" so as to create an actionable
hostile work environment claim.  *Harris*, 510 U.S. at 21 (internal citations and quotation marks
omitted).  Moreover, a plaintiff must allege that the incidents were "more than episodic; they
must be sufficiently continuous and concerted in order to be deemed pervasive."  *Littlejohn*, 795
F.3d at 321 (internal quotation marks omitted); *see also Fincher v. Depository Tr. & Clearing
Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) ("The plaintiff must show more than a few isolated
incidents of racial enmity.") (internal quotation marks omitted).  "Incidents that are few in
number and that occur over a short period of time may fail to demonstrate a hostile work
environment."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000)
(internal quotation marks omitted).  However, "even a single act can meet the threshold if, by
itself, it can and does work a transformation of the plaintiff's workplace."  *Alfano v. Costello*,
294 F.3d 365, 374 (2d Cir. 2002).

A plaintiff must also raise sufficient facts allowing a jury to reasonably conclude "that the
hostile work environment was caused by animus towards her as a result of her membership in a
protected class."  *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (quoting
*Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper*, 281 F. Supp. 2d 689, 704 (S.D.N.Y.

2003)).  As such, "an environment which is equally harsh for both [nonmembers and members of

a protected class] does not constitute a hostile working environment under the civil rights

statutes."  *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).  The same

requirement of causality applies to claims under Section 1981, Section 1983, and the NYSHRL.

*Bermudez*, 783 F. Supp. 2d at 578.  "It is 'axiomatic that mistreatment at work, whether through

subjection to a hostile environment or through other means, is actionable . . . only when it occurs

because of an employee's protected characteristic,' such as race or gender."  *Lloyd v. Holder*,

No. 11 Civ. 3154(AT), 2013 WL 6667531, at *11 (S.D.N.Y. Dec. 17, 2013) (quoting *Brown v.*

*Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

A court must consider the totality of the circumstances in evaluating a hostile work

environment claim, including "the frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.

"Facially neutral incidents may be included . . . among the 'totality of the circumstances' that

courts consider in any hostile work environment claim, so long as a reasonable fact-finder could

conclude that they were, in fact, based on [the protected characteristic].  But this requires some

circumstantial or other basis for inferring that [those facially-neutral] incidents . . . were in fact

discriminatory."  *Alfano*, 294 F.3d at 378.

The standard applied to a hostile work environment claim under the NYCHRL is more

liberal than its state and federal counterparts.  "[C]ourts must analyze NYCHRL claims

separately and independently from any federal and state law claims, construing the NYCHRL's

provisions broadly in favor of discrimination plaintiffs."  *Mihalik v. Credit Agricole Cheuvreux*

*N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations and quotation marks omitted).

The NYCHRL "does not require . . . [a showing of] severe and pervasive conduct." *Id.* at 114.

A plaintiff need only establish a triable issue of fact as to "differential treatment—that he was

treated less well—because of a discriminatory intent." *Carter v. Verizon*, No. 13 Civ.

7579(KPF), 2015 WL 247344, at *8 (S.D.N.Y. Jan. 20, 2015) (quoting *Mihalik*, 715 F.3d at

110); *see also Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 133 (S.D.N.Y. 2015).  However,

"petty, slight, or trivial inconveniences are not actionable." *Bermudez*, 783 F. Supp. 2d at 579

(internal quotation marks omitted).

Finally, a plaintiff pleading a hostile work environment at summary judgment must raise

facts sufficient to allow "a specific basis for imputing the conduct creating the hostile work

environment to the employer." *Britt v. Merrill Lynch & Co.*, No. 08 CV 5356(GBD), 2011 WL

4000992, at *13 (S.D.N.Y. Aug. 26, 2011) (citing *Feingold v. New York*, 366 F.3d 138, 150 (2d

Cir. 2004).  An individual defendant may be held liable under § 1981, the NYSHRL, and

NYCHRL for a hostile work environment "only if that individual is personally involved in the

alleged deprivation." *Littlejohn*, 795 F.3d at 314 (internal quotation marks omitted) (affirming

dismissal of § 1981 and § 1983 claims against a defendant where there was no factual basis for

inferring that the defendant personally participated in the alleged offensive conduct); *see also

Britt*, 2011 WL 4000992, at * 11 (applying this standard to NYSHRL and NYCHRL claims).

With respect to employer liability, common-law principles of agency control.  *Perry v.

Ethan Allen, Inc.*, 115 F.3d 143, 152 (2d Cir. 1997).  As such, "when a supervisor wields the

authority delegated to him by an employer . . . the supervisor's conduct is deemed to be that of

the employer, and the employer is liable for that conduct." *Id*. at 152–53.  In contrast, "when the

hostile environment is created by a coworker or by a low-level supervisor who does not rely on

his supervisory authority in carrying out the harassment, the employer is liable only if it has

either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* at 153 (internal quotation marks omitted).

### 2. Application

Plaintiff argues that she has raised sufficient facts allowing a reasonable factfinder to conclude that Defendants created a hostile work environment due to her race, ethnicity and/or national origin, therefore barring summary judgment on her hostile work environment claims. Defendants, on the other hand, contend that the events that Plaintiff alleges, whether taken "in isolation or their totality," (Doc. 99, Def. Mark-Viverito's Reply 1),[23] are not sufficiently "severe or pervasive" to establish a hostile work environment. Defendants further aver that they took these actions not because of discriminatory animus towards Plaintiff's protected characteristics, but rather because:  (1) she had a poor performance record; (2) she made a derisive comment to a Spanish resident; (3) Mill Brook amassed many repair complaints under her management; and (4) the Spanish-speaking Mill Brook residents had a difficult time communicating with the management office because they did not speak English.  Plaintiff counters that Defendants' explanations for their actions are simply pretextual and belied by the record.  (*See* Pl.'s Opp. Mem. 14–16.)

Plaintiff's hostile work environment claims arise out of five main sets of incidents described above, *supra* Part I:  (1) the July 30, 2015 meeting at which Defendant Mark-Viverito allegedly stated, "I want a Spanish manager;" (2) Defendant Clarke's directions to Colon to transfer Plaintiff based on the "cultural sensitivity needs" of the Mill Brook residents; (3) Defendant Clarke's allegedly hostile comments regarding Plaintiff's interactions with Spanish-

---

[23] "Def. Mark-Viverito's Reply" refers to Defendant Mark-Viverito's reply in support of her motion for summary judgment, filed May 15, 2020.  (Doc. 99.)

speaking residents at an August 28, 2015 meeting; (4) the NYCHA Defendants' inaction on

Plaintiff's housing assistant vacancies; and (5) the NYCHA Defendants' transfer and

replacement of Plaintiff's Spanish-speaking superintendent with an underperforming employee.

The first three events potentially reference race; the latter two events are facially neutral.

Accordingly, summary judgment is warranted unless the first three sets of incidents provide a

"basis for inferring that [those facially-neutral] incidents . . . were in fact discriminatory."

*Alfano*, 294 F.3d at 378.  I will first address the alleged discriminatory incidents in turn, and then

assess whether, taken together, all five incidents raise sufficient facts that would allow a

reasonable trier of fact to conclude that the NYCHA Defendants subjected Plaintiff to a hostile

work environment.

a.   <u>July 30, 2015 Meeting at Defendant Mark-Viverito's Office</u>

The NYCHA Defendants contend that no rational jury could find that Defendant Mark-

Viverito requested a "Spanish Manager" or that the Former Speaker stated anything or made any

demand related to race, ethnicity, or national origin during the July 30, 2015 meeting.  (NYCHA

Defs.' Mem. 3, 15.)  Defendant Mark-Viverito, separately, argues that "[a]lthough there is

conflicting testimony regarding whether Mark-Viverito requested a 'Spanish speaker,' a

'Spanish speaking manager,' a 'Spanish speaking housing assistant,' or a 'Spanish manager,'

such a distinction is immaterial," because "the record makes clear that Mark-Viverito's

comments and inquiries concerned language abilities, not race or ethnicity."  (Def. Mark-

Viverito's Mem. 10, 8.)

Defendants argue that the record establishes that Defendant Mark-Viverito's actual,

subjective motivation for calling the meeting and her comments was "the language barrier at Mill

Brook and language accessibility" rather than discriminatory animus.  (NYCHA Defs.' Mem. 12;

30

Def. Mark-Viverito's Mem. 8–9.)  They contend that Defendant Mark-Viverito did not request that someone with a particular race or nationality be assigned to Mill Brook and that this allegation "is wholly undermined by Williams' (and Colon's) own testimony and the entire record."  (NYCHA Defs.' Mem. 2, 10.)  Defendants accuse Plaintiff of erroneously "conflat[ing] the word 'Spanish,' meaning a language, with an ethnicity."  (NYCHA Defs.' Mem. 4, 18.) They further aver that, objectively, given contextual cues demonstrating that the purpose of the meeting was to address language barriers between the management office and residents of Mill Brook, "no rational jury could find that the Former Speaker's use of the word 'Spanish' during the July 30, 2015 meant anything other than the Spanish language."  (NYCHA Defs.' Mem. 14.) Defendants submit that it is not illegal for an employer to require foreign language skills for a job.  (*See* NYCHA Defs.' Mem. 13–14; Def. Mark-Viverito's Mem. 8.)  Therefore, they conclude, "there was absolutely nothing improper about the discussion of hiring a Spanish-language speaker in the Mill Brook management office during the July 30, 2015 meeting." (NYCHA Defs.' Mem. 14.)

I find that the events that allegedly transpired at the July 30, 2015 meeting are by themselves insufficient to support Plaintiff's hostile work environment claims against the NYCHA Defendants, albeit for different reasons than those raised by Defendants. As an initial matter, the record raises a triable issue of fact as to whether the Former Speaker stated at the July 30, 2015 meeting, "I want a Spanish Manager."  Although the NYCHA Defendants contest whether the Former Speaker spoke those precise words, their submissions do not establish that there is no genuine issue of material fact with regard to this question.

On the one hand, Defendant Mark-Viverito does not recall making the statement, "I want a Spanish Manager."  (Mark-Viverito Dep. Tr. 21:19-21.)  Defendant Clarke also denies that the

Former Speaker or anyone else requested that he "remove the manager at Mill Brook Houses," and claims that the Former Speaker never requested a "Spanish manager" at Mill Brook Houses. (Clarke Decl. ¶ 18.)  Artis does not recall the Former Speaker or anyone at the meeting requesting a "Spanish Manager," but testified that Defendant Mark-Viverito was "excited and passionate about the fact that that was unacceptable and she was adamant about there should be a Spanish-speaking individual in the office."  (Artis Dep. Tr. 26:24-27:3; 30:21-23.)  Artis states that he and Colon "concluded that Ms. Mark-Viverito wanted a Spanish-speaking manager."  (*Id.* at 38:14-17.)

On the other hand, Plaintiff submits her sworn testimony that Defendant Mark-Viverito said that she wanted to replace the current manager of the Mill Brook Houses with a "Spanish Manager."  (Williams Dep. Tr. 199:21-200:5.)  Colon corroborates Plaintiff's allegation testifying that Defendant Mark-Viverito slammed her fists at the meeting and thrice said, "I want a Spanish manager."  (Colon Dep. Tr. 136:1-137:16.)  At several points during her deposition, Colon also testified that the Former Speaker asked for a "Spanish Hispanic" manager.  (*Id.* at 186:18; 189:21-25; *see* Pl.'s Resp. to Mark-Viverito R. 56.1 Statement ¶ 78.)  Colon also testifies that after the meeting, she, Artis, and Williams discussed how it was "racist" that Defendant Mark-Viverito was "telling [them] that she want[ed] a Spanish Manager."  (Colon Dep. Tr. 156:12-14.)  I find that Plaintiff's testimony and Colon's testimony combined raise a triable issue of fact as to whether Defendant Mark-Viverito asked for a "Spanish Manager," in those precise terms, at the July 30, 2015 meeting.  However, I find that, even if a reasonable trier of fact could find that Defendant Mark-Viverito asked for a "Spanish Manager" at this meeting, this incident alone does not constitute sufficient basis for Plaintiff's hostile work environment claims.

As an initial matter, I note that Defendant Mark-Viverito was not employed by the executive branch of Government and had no role, management or otherwise, at NYCHA.  I also note this was the only time that Defendant Mark-Viverito and Plaintiff met or communicated with one another.  Although the conduct of a third party such as Defendant Mark-Viverito could be imputed to an employer for purposes of a hostile work environment claim where "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it," *see Perry*, 115 F.3d at 149 (internal quotation marks omitted), Plaintiff has not established that she did not have a reasonable avenue for complaint or that her single encounter with Defendant Mark-Viverito constituted harassment against which NYCHA needed to take action.  Defendant Mark-Viverito's actions at the meeting—isolated and limited as they were— do not rise to the level of severity sufficient to establish a hostile work environment under § 1981 and the NYSHRL.  Although Plaintiff may have subjectively perceived Mark-Viverito's statement and demeanor to be propelled by racial animus, (*see* Am. Compl. ¶ 23), this factor alone is not controlling; as noted above, the "mere utterance of an epithet which engenders offensive feelings in [an] employee does not sufficiently affect the conditions of employment to implicate Title VII," *Harris*, 510 U.S. at 21 (internal citations and quotation marks omitted).

First, the term "Spanish Manager" does not rise to the level of an epithet, let alone explicitly reference Plaintiff's race.  Second, although Defendant Mark-Viverito may have alluded to a desire to replace Plaintiff during the July 30, 2015 meeting, she had no immediate authority to impact the terms of Plaintiff's employment—as noted above, she was not part of the executive branch of Government and had no role, management or otherwise, at NYCHA—and, indeed, no adverse employment action against Plaintiff was taken during this meeting. Critically, the events of the July 30, 2015 meeting alone do not provide a basis to impute any of

Plaintiff's hostile work environment claims to the NYCHA Defendants, including her NYCHRL claims.  Other than Defendant Clarke's telephonic attendance at this meeting, Plaintiff has proffered no evidence or argument that Defendant Clarke, by act or omission, had any part in contributing to the alleged comments and actions by Defendant Mark-Viverito during this meeting.  Indeed, there is no indication in the record that Clarke expressed his agreement with Defendant Mark-Viverito's comments, or even said anything during this meeting.  (*See* Pl.'s Opp. Mem. 4 ("Clarke remained silent throughout the entire meeting."); Artis Dep. Tr. 36:23-25.)  Defendant Kelly did not attend this meeting, and there is no evidence in the record that he had even heard that Defendant Mark-Viverito had used the term "Spanish Manager" during Plaintiff's tenure.  There is no evidence that Defendant Mark-Viverito ever met with or spoke with Plaintiff again about Mill Brook, and Plaintiff has also raised scant evidence that Defendant Mark-Viverito later reached out to any NYCHA personnel, let alone Defendants Clarke and Kelly, to have Plaintiff removed as Manager of Mill Brook.  Defendant Clarke in fact explicitly stated that Defendant Mark-Viverito did not request that he remove Plaintiff.  Even more tellingly, Plaintiff herself testified that she does not recall personally learning that Defendant Mark-Viverito had been involved in asking for her removal; the basis for her belief was that she had heard from "the staff and some residents" at Mill Brook that Defendant Mark-Viverito wanted her removed.  (Williams Dep. Tr. 299:8-12; 298:4-24.)

Plaintiff's belief that Defendant Mark-Viverito wanted her replaced is mere conjecture and serves as an inadequate basis for drawing a causal link between the July 30, 2015 meeting and the subsequent events underlying her hostile work environment claims against the NYCHA Defendants.  Therefore, although I may consider the July 30, 2015 meeting as circumstantial evidence relevant to whether, under a totality of the circumstances, the NYCHA Defendants

created a hostile work environment for Plaintiff for discriminatory reasons, viewed as a standalone incident, Defendant Mark-Viverito's actions at the meeting do not establish adequate grounds for Plaintiff's hostile work environment claims against the NYCHA Defendants.

          b.  <u>Defendant Clarke's Directions to Transfer Plaintiff</u>

The NYCHA Defendants argue that the evidence demonstrates that Defendant Clarke's motivation for transferring Plaintiff out of Mill Brook was her performance record, rather than because Plaintiff did not speak Spanish.  (NYCHA Defs.' Mem. 16–18.)  They also argue that there is no evidence that Defendant Kelly was even aware that Defendant Clarke wanted to transfer Plaintiff.  (*Id*. at 18.)  However, I need not attempt to discern the NYCHA Defendants' intentions for attempting to transfer Plaintiff, because, under the circumstances presented here, regardless of the NYCHA Defendants' motives, the attempted transfer is alone insufficient to raise a hostile work environment claim under § 1981, the NYSHRL, and the NYCHRL.

I find that Defendant Clarke's aborted attempt to replace Plaintiff as Manager of Mill Brook is not, by itself, sufficient to establish a hostile work environment claim.  The record shows that Defendant Clarke's attempt to transfer of Plaintiff did not come to fruition, and Plaintiff continued working as the Manager of Mill Brook until her retirement in 2017.  In Plaintiff's own description, "there was no issue with Plaintiff's performance, since she retired after thirty-three years with NYCHA on May 1, 2017, and no proceeding was commenced by NYCHA to terminate her from employment."  (Pl.'s Resp. to NYCHA R. 56.1 Statement ¶¶ 17, 18, 20.)

Nor is there any indication that, during the period that Clarke was attempting to transfer Plaintiff, Plaintiff's work environment was adversely impacted in any way.  As an initial matter, Colon resigned on August 28, 2015, and Plaintiff did not retire until May 1, 2017, almost two

years later.  Moreover, it appears that the events surrounding the attempted transfer transpired

unbeknownst to Plaintiff until after the fact, when Colon allegedly informed her of Clarke's

directives.  (Am. Compl. ¶ 37.)  Plaintiff alleges that she feared the NYCHA Defendants would

remove her from her post following the meeting with Defendant Mark-Viverito; however,

Plaintiff fails to identify facts either in her Amended Complaint, in the record, or in her

opposition to Defendants' motions for summary judgment demonstrating that she was aware of

the NYCHA Defendants' attempt to remove her before Colon allegedly told Plaintiff that she

was instructed "to devise a plan to remove [Plaintiff] from her position."  (*Id*.)  Plaintiff does not

state when Colon made this statement to her, or indicate if the interaction occurred before or

after Colon's resignation, before Plaintiff's retirement from NYCHA, and when in relation to the

initiation of the instant lawsuit she had this conversation with Colon.  Other than Plaintiff's claim

that Colon disclosed to her on an unspecified date that she was directed to transfer Plaintiff for

discriminatory reasons, the record is devoid of evidence of any incidents or correspondences that

would have revealed to Plaintiff that an effort to replace her as Mill Brook Manager was

ongoing.  It is axiomatic that acts taken unbeknownst to a plaintiff cannot form the basis for a

hostile work environment claims.  *See Littlejohn*, 795 F.3d at 321 ("[T]he victim must

subjectively perceive the work environment to be abusive.") (internal quotation marks omitted);

*Cestone v. Gen. Cigar Holdings, Inc*., No. 00CIV3686RCCDF, 2002 WL 424654, at *3

(S.D.N.Y. Mar. 18, 2002) ("[H]earsay or harassment of which [a plaintiff was] unaware cannot

support a hostile work environment claim."); *see, e.g.*, *Davis v. N.Y. Dep't of Corr*., 256 F. Supp.

3d 343, 354 n.7 (S.D.N.Y. 2017) (discounting incident of harassment that came "to light during

the litigation" as factor contributing to a hostile work environment claim "because [p]laintiff did

not perceive it during his employment").  I also note that Colon resigned from NYCHA on

36

August 28, 2015, and there is no indication that she would have been aware of any efforts to transfer Plaintiff after that date about which she could have told Plaintiff.  Absent any other evidence that Defendant Clarke's behind-the-scenes effort to replace Plaintiff was apparent to Plaintiff or tangibly affected her work environment in any way, I find that this incident alone does not furnish sufficient evidence of a hostile work environment to survive summary judgment.

c.  <u>Defendant Clarke's Statements to Plaintiff at an August 28, 2015<br>Meeting</u>

Defendant Clarke's alleged aggressive statements regarding Plaintiff's communications with "Spanish residents" at Mill Brook during an August 28, 2015 meeting with NYCHA employees do not, taken in isolation, provide a sufficient basis for Plaintiff's hostile work environment claims against the NYCHA Defendants.  As an initial matter, although Defendant Clarke contests that the August 28, 2015 meeting did not take place, I find that Plaintiff has raised sufficient evidence to raise a triable issue of fact regarding whether the meeting occurred and, if so, what was said during the meeting.  As Plaintiff and Artis both testified, Clarke brought up the issue of having a Spanish-speaking employee at Mill Brook, and singled out Plaintiff in a hostile tone during this meeting.  Nonetheless, as discussed below, I find Defendant Clarke's demeanor and comments during this meeting alone insufficient to establish a hostile work environment claim.

Although Defendant Clarke may have been rude to Plaintiff during this meeting, NYSHRL, NYCHRL, and § 1981 hostile work environment claims are not appropriate venues for enforcing general workplace civility codes.  *See Mihalik*, 715 F.3d at 110 ("The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss.").  In light of Defendant Clarke's

37

responsibility as NYCHA Senior Vice President to serve the interests of all of NYCHA's residents, I find that he had a justifiable reason for asking Plaintiff if she was appropriately attending to those residents' language access needs.  Nor does Plaintiff furnish any evidence that Defendant Clarke did not hold other Housing Managers under his supervision to the same standard, or that he disciplined Plaintiff more severely due to her race or national origin.  In the absence of any proof of differential treatment, I decline to hold an employer liable for making inquiries regarding a legitimate, job-related concern that the ability of residents in NYCHA housing to communicate effectively with NYCHA staff—in particular the staff responsible for their buildings' operations—be addressed, albeit in a hostile tone of voice.  I also note that Defendant Clarke's alleged actions during this meeting occurred on August 28, 2015, and Plaintiff does not claim that this incident somehow continued to create a hostile work environment for her after the date of the meeting until her retirement on May 1, 2017.

### d.   Plaintiff's Housing Assistant Vacancies

Plaintiff also does not raise facts sufficient to show that Defendants engaged in a scheme to create a hostile work environment by deliberately failing to timely replace her HAs from late 2015 through 2016.  As the record makes clear, the four HAs were absent from work or transferred out of Mill Brook during this period for unforeseen reasons largely unrelated to Plaintiff or the named Defendants:  specifically, one went on FMLA leave, one was temporarily absent due to a death in the family, one was promoted to a position at a different residence, and one had her employment terminated by Plaintiff herself.  Short of any evidence that Defendants had a hand in removing Plaintiff's staff, it strains credulity to suggest that any intent to harm Plaintiff was involved in the understaffing of Mill Brook.

Moreover, while there were periods of time that Plaintiff's HA spots went unfilled,

Plaintiff does not raise any evidence to show that such delays between vacancies and staffing were out of the ordinary, or that NYCHA offered other residential locations preferential treatment with regards to the speed of staffing or re-staffing.  Nor does Plaintiff demonstrate that her workload was heavier due to the shortage of HAs than the workload of other managers at other OPMOM developments.  In fact, when asked during her deposition, Plaintiff admitted that she was unaware of whether or not other OPMOM developments were experiencing any staff shortages in the period between 2015 and 2016.  (William Dep. Tr. 151:14-152:4.)  In the absence of such proof of a baseline from which to judge Plaintiff's staffing and workload situations, I cannot find or infer that such staffing issues created a hostile work environment. *See, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 150 (2d Cir. 2006) (holding that the plaintiff's sex-based hostile work environment claim failed where she failed to present any evidence that other male employees "were or would have been treated differently under similar circumstances").  Indeed, Plaintiff herself concedes that she never saw a document representing that OPMOM developments would never be understaffed, and that she did not know whether other OPMOM developments always had their desired numbers of staff.  (NYCHA R. 56.1 Statement ¶ 169; *see* Williams Dep. Tr. 137:17-138:25.)

As Artis, who Plaintiff admits was responsible for handling HA vacancies at Mill Brook, explained, many of these delays were the inevitable result of making sure that the positions were filled by HAs who would be a "good fit" for the residence.  (Artis Dep. Tr. 22:6-15.)  Absent any proof that the periods of HA vacancy at Mill Brook were in any way the result of engineering (malicious or otherwise) by NYCHA management, let alone anomalous in the context of NYCHA staffing, Plaintiff does not establish a triable issue of fact as to "differential treatment—that [she] was treated less well—because of a discriminatory intent."  *Carter*, 2015 WL 247344,

at *8 (quoting *Mihalik*, 715 F.3d at 110).

Finally, even assuming that the delays in replacing Mill Brook HAs were the result of an attempt to create a hostile environment for Plaintiff, the record is devoid of evidence suggesting that the NYCHA Defendants or Defendant Mark-Viverito played any role in causing these periods of vacancy.  The lack of factual support for any connection between these events and the named Defendants dooms Plaintiff's hostile work environment claims based on alleged staffing delays.  "To make out a claim for individual liability under § 1981, a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . Similarly, a plaintiff must establish an individual defendant's personal involvement in the claimed violation to find him liable in his individual capacity under § 1983."  *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d. 351, 392 (S.D.N.Y. 2014) (internal quotation marks omitted).  "A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others."  *Id.* at 392–93 (internal quotation marks omitted).

To the extent that there were delays in replacing Mill Brook HAs, Plaintiff admits that it was her own responsibility to notify human resources of vacant housing positions through the submission of a PD2 form to the Human Resources Department, (Mark-Viverito R. 56.1 Statement ¶ 145; Williams Dep. Tr. 93:17-20), and that it was Artis's responsibility as Regional Asset Manager to replace them, (Williams Dep. Tr. 305:25-307:7).  The record demonstrates that Plaintiff did not timely file the PD2 forms even though she was complaining about vacancies. (Williams Dep. Tr. 142:20-23.)  Plaintiff does not allege that the named Defendants directly participated or supervised the challenged conduct, or had any responsibility for handling the

staffing of Mill Brook HAs.  The record does not contain proof of any correspondence from Plaintiff's office to Defendants Clarke or Kelly regarding Mill Brook's staffing issues or any other basis for inferring that the individual Defendants had reason to know of the unfilled HA positions, or that they actively sought to impede the filling of vacancies at Mill Brook. Moreover, to the extent that Plaintiff seeks to hold Defendant NYCHA responsible for Artis's delays in replacing her HAs either by act or failure to supervise, I can discern no arguments in her motion papers or facts in the record that would allow a reasonable factfinder to draw such a conclusion.  As such, any claim that the NYCHA Defendants were aware of Plaintiff's staffing predicament, let alone were deliberately indifferent to it, lacks sufficient factual support to survive summary judgment.  Indeed, even assuming that the events leading up to the departure of Plaintiff's HAs evince discriminatory intent by Defendants, Plaintiff herself admits that she does not know whether there is a connection between the departure or arrival of any HA and the July 30, 2015 meeting with the Former Speaker.  (Pl.'s Resp. to NYCHA R. 56.1 Statement ¶¶ 143, 146, 148, 152, 154, 165.)  Moreover, Plaintiff does not point to evidence in the record from which a reasonable inference can be drawn of such a connection.  Such a dearth of evidence linking Defendants to the alleged claims of deliberate understaffing is insufficient to raise an issue of fact concerning the existence of a hostile environment for the claim to survive summary judgment.

Therefore, I will not consider Plaintiff's claim that the NYCHA Defendants failed to timely fill Mill Brook HA vacancies as part of my analysis of whether, under a totality of the circumstances, a claim for a hostile work environment lies.

e.   Transfer of Plaintiff's Superintendent

Defendants argue that there is no evidence connecting the replacement of Plaintiff's

superintendent Martinez with an employee named Limo in 2017 to the meeting with Defendant Mark-Viverito that happened two years prior.  (Def. Mark-Viverito's Reply 8–9; NYCHA Defs.' Reply 2.)[24]  As in initial matter, Limo had only been on the job two weeks—hardly enough time for Limo to have developed a record on underperforming at Mill Brook—when Plaintiff retired. Moreover, as the NYCHA Defendants point out, Plaintiff was not issued a counseling memorandum or disciplined as a result of Limo's allegedly poor performance; rather a disciplinary hearing was requested for Plaintiff in April 2017 due to her own performance deficiencies.  (*Id*. at 2.)  Stated differently, to the extent that Limo underperformed, Plaintiff fails to identify any evidence in the record that Limo's alleged underperformance materially altered Plaintiff's conditions of employment.

Defendants also point out that Martinez's transfer was not unusual or illicit, and that Plaintiff recognizes that there is no NYCHA policy allowing OPMOM managers to choose the identity of their staff or prohibiting transfers of employees in the OPMOM Program.  (Def. Mark-Viverito's Reply 9; NYCHA Defs.' Reply 2; Williams Dep. Tr. 271:9-16.)  As such, they contend that Martinez's transfer is insufficient to support Plaintiff's hostile work environment claim.  Defendants are correct.  Plaintiff does not advance any evidence in support of her theory that Martinez's transfer took place for improper reasons related to her race and/or national origin, or was in any way connected to the alleged discriminatory events of 2015.  The events are remote in time and the key characters alleged to be at the center of each event are unrelated. Absent any concrete evidence, Plaintiff has failed to raise any inference allowing a trier of fact to conclude that she was treated less well "because of a discriminatory intent."  *Carter*, 2015 WL

---

[24] "NYCHA Defs.' Reply" refers to the NYCHA Defendants' reply in support of their motion for summary judgment against Plaintiff Allison Williams, filed May 15, 2020.  (Doc. 100.)

247344, at *8 (quoting *Mihalik*, 715 F.3d at 110).  Plaintiff has not demonstrated any affirmative

link causally connecting Defendants Clarke and Kelly with the alleged discriminatory action

here.  Nor can she plausibly assert that such a link exists, when Plaintiff herself has

acknowledged that Artis, and not the named individual Defendants, was the NYCHA employee

responsible for transferring and replacing Mill Brook superintendents.  Moreover, because

Plaintiff has not identified any specific NYCHA individuals as responsible for the transfer of

Martinez, Plaintiff has not adequately put forth any theory of liability linking Defendant

NYCHA to the alleged improper conduct.

Since Plaintiff failed to identify any evidence of untoward conduct by Defendants Clarke,

Kelly, NYCHA, or Mark-Viverito with respect to Martinez's transfer, or a factual basis for any

link between the transfer and the alleged discriminatory events, I decline to consider this event as

part of Plaintiff's hostile work environment claims against the NYCHA Defendants.

    f.   The Totality of Events Does Not Establish a Triable Issue as to
        Plaintiff's Hostile Work Environment Claims

To summarize, Plaintiff has raised triable issues of fact regarding (1) alleged statements

by Defendant Mark-Viverito at a July 30, 2015 meeting indicating that she wanted Plaintiff

replaced with a "Spanish Manager;" (2) an unsuccessful attempt by Defendant Clarke in late

2015, discussed with Defendant Kelly, to transfer Plaintiff out of Mill Brook; and (3) alleged

statements by Defendant Clarke at an August 28, 2015 meeting asking Plaintiff how she spoke to

"Spanish residents" at Mill Brook, in a hostile or accusatory tone of voice.  As discussed above,

Plaintiff has failed to establish facts showing that the remaining two events—the movement of

Plaintiff's HAs between late 2015 and 2016, and the replacement of Plaintiff's superintendent in

2017—are in any way connected to the other three alleged discriminatory events of 2015 or

otherwise motivated by discriminatory intent on the part of the NYCHA Defendants.

Furthermore, as noted above, not one of the three supposedly discriminatory incidents is by itself sufficient to support a hostile work environment claim against the NYCHA Defendants.

Considering now the remaining incidents in their totality, I find that these three incidents combined are also inadequate to support Plaintiff's hostile work environment claims. Viewing the evidence in a light most favorable to Plaintiff, the events of the June 30, 2015 meeting with Defendant Mark-Viverito could provide a basis for a reasonable factfinder to infer racial animus for the following actions taken by Defendant Clarke against Plaintiff. However, Defendant Clarke's actions or omissions did not alter Plaintiff's employment and "create an abusive working environment." *Littlejohn,* 795 F.3d at 320–21. That is, his unsuccessful and aborted effort to transfer Plaintiff (of which Plaintiff has presented no evidence that she was aware during her employment at NYCHA) and his comments and inquiries regarding the way that Plaintiff spoke to the "Spanish residents" of Mill Brook during an August 28, 2015 meeting are by themselves insufficient to show that the NYCHA Defendants subjected Plaintiff to any differential treatment on the basis of race, let alone any adverse consequences that I can consider in analyzing Plaintiff's hostile work environment claims. It also strains credulity that the August 28, 2015 meeting and Clarke's unsuccessful attempt to have Plaintiff transferred from Mill Brook somehow precipitated or had any connection whatsoever with Plaintiff's retirement almost two years later.

As discussed above, Plaintiff has not shown that the behind-the-scenes effort to replace her tangibly impacted her work environment. Plaintiff has not raised any evidence or lines of reasoning that would allow a trier of fact to infer that Defendant Clarke would not have subjected another housing manager of a different race, ethnicity and/or national origin than Plaintiff to the same treatment in service of legitimate concerns about language barriers between NYCHA and

the residents the agency served.  Unmoored from the other alleged incidents—in particular, the

movements of Plaintiff's personnel to the detriment of her productivity—Plaintiff's remaining

allegations show, at most, a strained relationship between Clarke and Plaintiff which may

occasionally have bubbled to the surface during interactions between the two, but by no means

one that erupted into a full-fledged hostile work environment for Plaintiff.  As such, these three

alleged events are insufficient to establish a triable issue of fact that the NYCHA Defendants

subjected Plaintiff to a hostile work environment on the basis of her race and/or national origin.

Although Defendant Clarke's actions, if established, do not amount to a hostile work

environment, it also bears noting that the evidence connecting Defendant Kelly and Defendant

NYCHA to the incidents in question is even more sparse and attenuated.  Plaintiff has not

supplied any evidence that Kelly was aware of the bulk of the events that form the remaining

basis for her hostile work environment claims.  Kelly did not attend either the July 30 or the

August 28, 2015 meeting, and there is no evidence that he was placed on notice of any racially

inflected statements directed at or involving Plaintiff.  Even if it were established that Kelly

authorized Clarke's attempt to transfer Plaintiff out of Mill Brook, as Plaintiff has admitted, such

transfers were customarily at the discretion of NYCHA, and the record does not contain any facts

showing that Kelly was aware of any potentially discriminatory reasons for the transfer.

Furthermore, as the transfer never happened, Plaintiff cannot argue that Clarke indeed "wield[ed]

the authority delegated to him" by Kelly or NYCHA.  *Perry*, 115 F.3d at 152.  Moreover,

Plaintiff herself was seemingly unaware of the attempted transfer as it was happening; even if

she had been aware of any adverse conduct by Clarke, it appears that she did not attempt to raise

any complaints about such alleged discriminatory actions to Kelly or other high-level officers at

NYCHA.  Plaintiff thus presents no "basis for imputing the conduct creating the hostile work

environment" to Kelly or NYCHA. *Britt*, 2011 WL 4000992, at \*13 (quoting *Feingold*, 366 F.3d at 150).

Plaintiff's hostile work environment claims against the NYCHA Defendants are accordingly DISMISSED.

### B.   *NYSHRL and NYCHRL Aiding and Abetting Claims (Counts Three and Four against Defendant Mark-Viverito and the NYCHA Defendants)*

#### 1.   **Applicable Law**

An individual defendant may be held liable under § 296(6) of the NYSHRL or § 8-107(6) of the NYCHRL for aiding and abetting a violation of the laws "if he participates in the conduct giving rise to the discrimination claim." *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009).  "The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is virtually identical." *Feingold*, 366 F.3d at 158 (internal quotation marks omitted). However, an aiding and abetting claim is only viable when an underlying violation has taken place.  *See Falchenberg v. N.Y.S. Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009). Accordingly, "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011), *aff'd*, 506 F. App'x 47 (2d Cir. 2012) (quoting *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999)).  Furthermore, the alleged aider and abettor must have "actually participate[d] in the conduct giving rise to a discrimination claim" to be held liable under the NYSHRL and NYCHRL.  *Feingold*, 366 F.3d at 158 (internal quotation marks omitted).

#### 2.   **Application**

As discussed above, Plaintiff has failed to raise evidence in support of her hostile work

environment claims against the NYCHA Defendants sufficient to defeat summary judgment. While it is doubtful that the record shows that Defendant Mark-Viverito actually participated in the bulk of the alleged conduct giving rise to her hostile work environment claim, I need not decide whether Plaintiff has raised sufficient facts to defeat summary judgment on that basis. Because Plaintiff's underlying hostile work environment claims directed against any of the NYCHA Defendants fail, Plaintiff's claims against Defendants Clarke, Kelly, NYCHA, and Mark-Viverito for aiding and abetting a hostile work environment also must fail.

Accordingly, Plaintiff's claims against Defendant Mark-Viverito and the NYCHA Defendants for aiding and abetting a hostile work environment are DISMISSED.

### V.      **Conclusion**

For the foregoing reasons, Defendants' motions for summary judgment dismissing Plaintiff's Amended Complaint are GRANTED.  The Clerk of Court is respectfully directed to terminate the open motions at Documents 76, 83, and 84 and close the case.

SO ORDERED.

Dated: May 24, 2021
       New York, New York

Vernon S. Broderick
United States District Judge